**PPG INDUSTRIES, INC., Appellant,**

v.

**JMB/HOUSTON CENTERS PARTNERS LIMITED PARTNERSHIP, Appellee.**

No. 14–98–00154–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 8, 2001.

David W. Holman, Helen A. Cassidy, Charles R. Dunn, W. Frances Moore, David M. Gunn, Houston, for appellants.

Lynne Liberato, Alene R. Levy, David Crump, H. Bruce Golden, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices ANDERSON and HUDSON.

## OPINION

HUDSON, Justice.

Defendant PPG Industries, Inc., appeals from an adverse judgment in a lawsuit in which JMB/Houston Centers Partners Limited Partnership asserted claims for violations of the Deceptive Trade Practices Act and for breach of warranty. We affirm the judgment.

Houston Center Corporation constructed a forty story office building in downtown Houston during the mid–1970s known as One Houston Center. Over ninety percent of the exterior surface is glass. Approximately 12,219 units of a PPG product called Twindows, an insulating dual-pane glass window product, were used to sheath the building.

In December 1989, Houston Center Corp. sold the building to JMB. In July 1994, after many of the windows had fogged up and/or discolored, JMB sued PPG, alleging breach of warranty and violations of the DTPA. Jurors found in JMB's favor on both its DTPA and breach of warranty claims and determined that JMB had sustained $4,745,037 in damages. Electing the greater remedy provided by the DTPA, the trial court awarded treble damages under the 1973 version of the DTPA. Thus, JMB was awarded $14,235,111 in damages and prejudgment interest from June 14, 1994. After a bench trial, the trial court also awarded $1,716,181 in attorney fees for the trial and $412,400 in appellate attorney fees for this appeal.

### TREBLE DAMAGES

The Deceptive Trade Practices Act has undergone numerous revisions. The 1973 version of the DTPA provided for *mandatory* trebling of damages.[1] The 1979 amendment to the DTPA provided for *discretionary* trebling of damages if

1. *See* Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex.Gen.Laws 322, 377; *Woods v. Littleton,* 554 S.W.2d 662, 671 (Tex. 1977).

there was a knowing violation of the statute.[2] Likewise, the 1989 amendment to the DTPA also speaks in terms of a *discretionary* trebling of damages .[3] The trial court applied the 1973 version of the statute and trebled the damages. In its first issue, PPG contends the 1989 statute was the appropriate version to be applied by the court; thus, the trial court erred in awarding mandatory treble damages.

■ The issue regarding which version of the statute should have been applied by the trial court is a question of law, which we review de novo. *See Lozano v. Lozano,* 975 S.W.2d 63, 66 (Tex.App.— Houston [14th Dist.] 1998, pet. denied) (statutory interpretation a question of pure law over which judge has no discretion). The date of the deceptive acts that give rise to the cause of action under the DTPA determines the applicability of the act. *See Woods v. Littleton,* 554 S.W.2d 662, 666 (Tex.1977).

To determine which version of the statute applies, we first review the deceptive acts alleged by JMB. Among the deceptive acts alleged by JMB is the original sale of defective window units which occurred in 1976. Accordingly, unless the 1979 or 1989 versions have retroactive applicability, the 1973 version of the statute is effective.

As for the 1979 amendment, the legislature expressly provided that it would have prospective application only; that is, the amendment does not apply to a cause that "arose in whole or in part" prior to the effective date of the amendment, i.e., August 27, 1979. *See* Act of May 11, 1979, 66th Leg., R.S. ch. 603, § 9, 1979 Tex.Gen. Laws 1327, 1332; *Barrett v. U.S. Brass Corp.,* 864 S.W.2d 606, 625 (Tex.App.—

Houston [1st Dist] 1993), *rev'd on other grounds,* 919 S.W.2d 644 (Tex.1996). Because the representations and sale of defective window units occurred prior to August 27, 1979, the 1979 amendment does not apply.

■ As for the 1989 amendment, it applies to all actions or claims "commenced" on or after the effective date of the amendment, i.e., September 1, 1989. *See* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 6, 1989 Tex.Gen.Laws 1490, 1493. A civil suit commences in district court by the filing of the petition with the office of the clerk. *See* Tex.R.Civ.P. 22. Here, the original petition was filed July 21, 1994, after the effective date of the amendment. Nevertheless, we find the amendment is not applicable because of the limited scope of the amendment.

The 1989 amendment revised Section 17.50(b) of the Business and Commerce Code to bring it into compliance with tort reform changes to Chapters 33 and 41 of the Civil Practices and Remedies Code. The 1989 amendment limited damages awarded for: (1) death; (2) personal injury other than mental anguish or distress associated with a violation of a particular subchapter of the statute that did not involve death or bodily injury; or (3) damage to property other than the goods acquired by purchase or lease that is involved in the consumer's action or claim if that damage arose out of an occurrence that involved death or bodily injury. *See* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 2, 1989 Tex.Gen.Laws 1490, 1491. Here, however, the damages were not associated with death or personal injury, but were purely property

---

**2.** *See* Act of May 11, 1979, 66th Leg., R.S., ch. 603, § 4, 1979 Tex.Gen.Laws 1327, 1329–30; *Martin v. McKee Realtors, Inc.,* 663 S.W.2d 446, 447 (Tex.1984).

**3.** *See* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 2, 1989 Tex.Gen.Laws 1490, 1491.

related.[4] Moreover, while the legislature specifically provided that "This Act" applies to all actions commenced on or after September 1, 1989, the reference to "This Act" applies not to the entire DTPA, but only to the 1989 amendatory language.[5]

Thus, we find the trial court correctly applied the 1973 version of the DTPA. Accordingly, we overrule PPG's first issue.

### CONSUMER STATUS

■ The DTPA provides a cause of action only for "consumers." In 1975, shortly before Houston Center Corp. purchased the window units from PPG, the DTPA definition of "consumer" was expanded to include corporations.[6] Thus, under the DTPA, Houston Center Corp. was a "consumer." But while Houston Center Corp. may have had a right to sue under the statute, PPG contends that JMB is not a "consumer" in its own right and a cause of action under the DTPA is a personal, punitive right that cannot be assigned. Thus, in its second issue, PPG claims JMB cannot lawfully bring a DTPA claim.

### *Assignability*

■ In general, one may assign all property rights, including choses in action. *See Doty v. Caldwell*, 38 S.W. 1025 (Tex. Civ.App.1897). A cause of action is a property right capable of being assigned in whole or in part. *See Browne v. King*, 196 S.W. 884, 887 (Tex.Civ.App.—San Antonio

1917), *aff'd*, 111 Tex. 330, 235 S.W. 522 (1921). Causes of action based on breach of contract, or breach of implied or express warranty are assignable. *See Roach v. Schaefer*, 214 S.W.2d 128, 130 (Tex.Civ. App.—Fort Worth 1948, no writ) (insurer's cause of action for unpaid premiums assignable); *Tolar v. South Tex. Dev. Co.*, 153 S.W. 911, 913–14 (Tex.Civ.App.—El Paso 1913, writ ref'd) (cause of action for specific performance assignable); *see also* TEX.BUS. & COM.CODE ANN. § 2.210(b) (Vernon Supp.2000) (Tex.UCC) ("right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise"). A claim for tortious injury to property also is assignable. *See Wichita City Lines, Inc. v. Puckett*, 288 S.W.2d 122, 124 (Tex. Civ.App.—Fort Worth), *aff'd*, 156 Tex. 456, 295 S.W.2d 894 (1956).

Although there is a split of authority on the issue, several courts of appeals have either found, or assumed, that DTPA claims are assignable. *See Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595, 610 (Tex. App.—Tyler 1984, writ ref'd n.r.e.) (assignment extended to actions brought under DTPA); *see also Hart v. First Fed. Sav. & Loan Ass'n*, 727 S.W.2d 723, 725 (Tex. App.—Austin 1987, no writ) (guarantors denied recovery under DTPA because debtor did not assign them DTPA action); *Rosell v. Farmers Tex. County Mut. Ins. Co.*, 642 S.W.2d 278, 279 (Tex.App.—Texarkana 1982, no writ) (plaintiff-assignee

---

4. One commentator noted that the 1989 Legislature specifically excluded limitations on damages to the consumer good itself. *See* John T. Montford, *1989 DTPA Reform: Closing the DTPA Loophole in the 1987 Tort Reform Laws and the Ongoing Quest for Fairer DTPA Laws*, 21 ST. MARY'S L.J. 525, 541 (1990). Only damage to property that arises out of an occurrence involving death or personal injury is subject to the damage limits. *See id.*

5. *See* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 6, 1989 Tex.Gen.Laws 1490, 1493.

6. " 'Consumer' means an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services." Act of April 10, 1975, 64th Leg., R.S., ch. 62, § 1, 1975 Tex.Gen.Laws 149.

denied DTPA recovery because assignor was not DTPA consumer).

Further, assignability of a DTPA cause of action is in accord with the legislature's purpose for enacting the DTPA. The Legislature intended that the DTPA be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, breaches of warranty and to provide efficient and economical procedures to secure such protection." *See* Tex. Bus. & Com.Code Ann. § 17.44(a) (Vernon Supp.2000).

■■■ Because questions of assignability and survivability are linked, we find it helpful to view the survivability of an action to help determine its assignability. In Texas, at common law, if an action survives the death of a claimant, the cause of action is assignable. *See Harding v. State Nat'l Bank of El Paso,* 387 S.W.2d 768, 769 (Tex.Civ.App.—El Paso 1965, no writ). While lower courts have differed in their holdings, the Texas Supreme Court has reserved the issue of the survivability of a DTPA cause of action. *See Shell Oil Co. v. Chapman,* 682 S.W.2d 257, 259 (Tex.1984).

The San Antonio court, finding a DTPA treble-damage claim did not survive, held that the DTPA was a private cause of action and "clearly punitive in nature." *See First Nat'l Bank of Kerrville v. Hackworth,* 673 S.W.2d 218, 221 (Tex.App.—San Antonio 1984, no writ) (en banc). The Fort Worth court declined to follow *Hackworth,* finding that several purposes underlay the treble-damages provision of the DTPA, punishment of the specific wrongdoer being only one. *See Thomes v. Porter,* 761 S.W.2d 592, 595 (Tex.App.—Fort

Worth, 1988, no writ). The treble-damage provisions also discourage violations of the DTPA by other sellers. *See id.* Further, survivability accords with legislative intent. *See id.; see also Mahan Volkswagen, Inc. v. Hall,* 648 S.W.2d 324, 332–33 (Tex. App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.) (modified on rehearing) (decedent's claim for DTPA treble damages survived to heirs and heirs' legal representatives). *See generally* Richard Alderman, The Lawyer's Guide to the Texas Deceptive Trade Practices Act, § 2.06 n.123 (1998); Lorette Bauarschi, Comment, *Survival Under the Texas Deceptive Trade Practices Act,* 28 Hous.L.Rev. 591, 615–17 (1991).

Finally, the DTPA claims asserted here are in the nature of claims for breach of express warranty. Courts have found breach of warranty claims and injury to property claims assignable. *See Puckett,* 288 S.W.2d at 124 (injury to property); *Roach,* 214 S.W.2d at 130 (breach of warranty). Accordingly, we find that these DTPA claims are also assignable. Whatever DTPA claims Houston Center Corp., the original owner, had against PPG were assigned to JMB when JMB acquired One Houston Center in 1989.

### *Business consumer*

■■■ PPG next contends a 1983 amendment to the DTPA definition of "consumer," whether retroactive or prospective in its application, extinguished JMB's DTPA claim.

In 1983, the definition of "consumer" under the DTPA was amended to exclude business consumers with assets of $25 million or more.[7] JMB has assets in excess of $25 million; thus, it is not a consumer.

---

7. "[T]he term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 mil-

lion or more." Act of May 19, 1983, 68th Leg. R.S., ch. 883, § 2, 1983 Tex.Gen.Laws 4943, 4944.

Moreover, PPG claims that because the 1983 amendment had no savings clause, the amendment was immediately effective; thereby, extinguishing Houston Center Corporation's status as a consumer because it also had assets in excess of $25 million. Because JBM's predecessor, Houston Center Corp., could not bring a DTPA claim against PPG in 1989 when it sold One Houston Center, PPG claims JMB could not acquire any such claim by assignment.

The 1983 amendment contained in House Bill 1438 made three separate changes to the DTPA: (1) a business consumer with assets of $5 million or more may, by written contract, waive the protections of the DTPA; (2) the definition of "consumer" was amended to exclude a business consumer that has assets of $25 million or more; and (3) a definition for "business consumer" was added.[8] The act then contains the following provision:

> This Act applies only to a contract executed on or after the effective date of this Act. A contract executed before the effective date of this Act is governed by the law in effect when the contract was executed.

*Id.,* § 4 at 4944.

JMB contends that since the contract of sale for the window units was executed in 1976, the aforementioned savings clause requires that we apply the law in effect at the time the contract was executed. PPG, on the other hand, claims the aforementioned provision is not a "savings clause" at all; rather, it merely provides that contracts executed before the effective date of the amendment remain unaltered by the amendment. In other words, the provision refers only to section one of the bill regarding the efficacy of written waivers of DTPA liability. *See* Andy A. Tschoepe, Stanley E. Crawford, Jr., and David Jed Williams, *Aspects of Defending a Texas Deceptive Trade Practices—Consumer Protection Act Claim,* 20 St. Mary's L.J. 527, 554–56 (1989).[9]

However, we need not decide whether the provision is a "savings clause" because all statutes are presumed to be prospective in their operation unless expressly made retrospective. *See* Tex.Gov't Code Ann. § 311.022 (Vernon 1998). Thus, the amendment of a statute does not affect "any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it." Tex.Gov't Code Ann. § 311.031 (Vernon 1998). Moreover, the Legislature has expressly made these code construction provisions applicable to "each code enacted by the 60th or a subsequent legislature as part of the state's continuing statutory revision program." Tex.Gov't Code Ann.

---

8. *See* Act of May 19, 1983, 68th Leg., R.S., ch. 883, §§ 1–3, 1983 Tex.Gen.Laws 4943, 4944.

9. The authors of the article propose:
 There is no savings clause in the 1983 amendments to the DTPA which would save a business consumer's pending cause of action. The savings clause of the 1983 amendments is applicable only to contracts executed before the effective date of the amendment (i.e., waivers of DTPA claims in contracts executed before effective date are not valid.)
 The Texas Legislature clearly distinguishes its express intent regarding the immediate application of the 1979 and 1981 amendments to a pending cause of action from the 1983 amendments. In 1983, the legislature expressly chose to "save" only existing contracts (i.e., no valid disclaimer of DTPA rights in contracts executed before effective date) from immediate or retroactive application, and did not intend to "save" the cause of action of a business consumer (with more than $25 million in assets) arising in whole or in part prior to the effective date of such amendment.
 *Id.,* at 555.

§ 311.002 (Vernon 1998). Accordingly, we find the 1983 amendment has no retrospective application.

■■■ PPG contends, in the alternative, that since the sale between Houston Center Corp. and JMB occurred in 1989, the 1983 amendment effectively denied consumer status to JMB. However, JMB is not asserting its own claim, but one it obtained by assignment. In such a scenario, we look not to the status of the assignee, but to the status of the assignor. *See Thomes*, 761 S.W.2d at 594 (executrix's consumer status immaterial; she asserts cause of action for deceased consumer); *Mahan Volkswagen*, 648 S.W.2d at 333 (cause of action survives because decedent's consumer status). Thus, JMB need not be a consumer in its own right.

### Waiver of DTPA Claims

■■■ Thirdly, PPG contends that JMB cannot assert a DTPA cause of action against PPG because under its purchase contract with the original owner, JMB acquired no DTPA claims. The purchase contract provided, in part, as follows:

> Buyer [JMB] represents and warrants to Seller [Houston Center Corp.] that Buyer seeks to purchase the Project for commercial or business use and that Buyer has assets of $25 million or more or is or owned or controlled by a Person with assets of $25 million or more. Accordingly, Buyer acknowledges, represents and warrants that it is a "business consumer" as that term is defined by the Texas Deceptive Trade Practices Consumer Protection Act ("DTPA"), Subchapter E of Chapter 17 of the Texas Business and Commerce Code, and as such, the DTPA is not in any way applicable to the transactions contemplated by this Agreement.

The contract language PPG relies upon refers to the acquisition of One Houston Center by JMB from the seller, Houston Center Corp.; that is, JMB arguably waived a DTPA cause of action against Houston Center Corp. in connection with its acquisition of One Houston Center. The language does not prohibit the assignment of any preexisting DTPA claims by Houston Center Corp.

We conclude, therefore, that JMB can assert DTPA claims assigned by Houston Center Corp., entitling JMB to treble damages under the DTPA. We overrule PPG's second issue.

### STATUTE OF LIMITATIONS

JMB asserts three causes of action, DTPA, breach of a twenty-year warranty, and breach of a five-year warranty. In its third issue, PPG contends these claims are barred by the statute of limitations. PPG advances four arguments: (1) Houston Center Corp. and JMB had notice of defects prior to September 25, 1989, which bars recovery on all causes of action; (2) because Houston Center Corp. and JMB had notice of defects, the statute of limitations was not tolled by repair efforts or fraudulent concealment; (3) limitations bars JMB's claims under the five-year warranty; and (4) limitations bars JMB's claims under the twenty-year warranty.

### Discovery rule

■■■ Under the discovery rule, a cause of action accrues when a claimant discovers or in the exercise of reasonable diligence should have discovered the injury and that the injury was likely caused by the wrongful acts of another. *See Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998). The discovery rule applies both to claims under the DTPA[10] and breach of

---

10. *Id.*

express warranty where the warranty has a specific provision covering future performance.[11] When the facts are not disputed, the question of when a cause of action accrues is a question of law. *See Loyd v. ECO Resources, Inc.,* 956 S.W.2d 110, 126 (Tex.App.—Houston [14th Dist.] 1997, no writ). Whether a plaintiff knew or should have known of an injury generally is a question of fact. *See Houston Endowment Inc. v. Atlantic Richfield Co.,* 972 S.W.2d 156, 160 (Tex.App.—Houston [14th Dist.] 1998, no writ). The party seeking to benefit from the discovery rule bears the burden of proving and securing favorable findings thereon. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex. 1988).

 We review PPG's discovery rule complaint under a no-evidence standard. When the party opposing a claim or defense has lost the issue at trial, it may attack the legal sufficiency of the evidence by establishing that there was no evidence to support the finding in favor of the opponent's claim or defense. *See Garza v. Alviar,* 395 S.W.2d 821, 824 (Tex.1965). We will sustain the challenge when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively proves the opposite of the vital fact. *See Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). In reviewing the evidence under a no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See*

*Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex. 1998). In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to the level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* at 286; *see generally* 6 McDonald & Carlson, Texas Civil Practice § 44:9 (1998).

 The parties signed a tolling agreement on September 24, 1993, stating that injuries discoverable before September 24, 1989, were not actionable. JMB had the burden at trial of proving that it did not discover the injury or that the exercise of reasonable diligence would not have led to the discovery of the injury. PPG must negate this fact by showing that the evidence establishes conclusively the opposite of this vital fact, i.e., that JMB discovered the injury or that the exercise of reasonable diligence would have led to the discovery before September 24, 1989. *See Havner,* 953 S.W.2d at 711.

The evidence shows that in July 1982, Cadillac Fairview, the building management company for Houston Center Corp., the original owner, notified W.C. Bellows Construction Corp., the contractor, that there was some "deterioration of the reflective coating" on the windows. In September 1982, a Bellows representative, D.K. Morris, was told by Jerry Rapp, of PPG, that the discoloration "could possibly be a defect in the manufacturing process." Morris in a memo stated that "it would be my guess that fifty per cent of the [window units were in] various stages of deterioration." In May 1983, Houston Center Corp. was told by PPG that there were approximately 1,400 defective windows, that 1,000

---

11. *See Cornerstones Mun. Util. Dist. v. Monsanto Co.,* 889 S.W.2d 570, 577 (Tex.App.— Houston [14th Dist.] 1994, writ denied).

more would have to be replaced, and that PPG was not sure what had caused the deterioration of the coating or whether the deterioration would occur in all units. Between 1982 and 1985, PPG replaced more than 3,000 units. In March 1985, a Cadillac Fairview representative, Mark McMullen, stated in a memo that PPG had told him "there is no way to predict if more [units] will become affected." He stated, "I suspect that formulation of the coating or application to the glass was substandard. PPG may simply be attempting to provide a scientific explanation when an apology for sloppy workmanship may be more appropriate."

In August 1989, JMB conducted a building inspection as part of its acquisition of One Houston Center. JMB's glass consultant, Heitmann & Associates of St. Louis, Missouri, issued a report in which it told JMB that the window discoloration "would seem to bear further investigation." Heitmann informed JMB that the failures may have been caused by a coating failure, a failed edge seal, or a combination of the two. It recommended that the window failure be investigated and "reviewed by [PPG] to determine the exact cause of the failure before a glass unit replacement program is initiated."

The evidence also shows, however, that as early as 1985, PPG represented to JMB that the problem had been solved. In October 1984, a PPG internal memo written by William Unrath suggested that the discoloration problem at One Houston Center was getting worse and that Jerry Lynass, PPG's field representative, was to replace the units in question and to "not say anything to anybody." JMB presented evidence that PPG had determined the window units contained a design defect, namely, that all units made using the "wet deposition process" were latently defective. PPG determined that the film failed at the edge of the units because the sealant "attacked" the film. Evidence also showed that due to the windows' aspect ratio, PPG could not make units that would not fail. Moreover, there is some evidence that PPG concealed this information from JMB.

Although a window-failure rate of 25% might suggest something was amiss, JMB was entitled to rely on PPG's statements that failure of the units was an isolated phenomenon and that PPG had corrected the problem by replacing failed units. *See City of Austin v. North Austin State Bank*, 631 S.W.2d 564, 566–67 (Tex.App.— Austin 1982, no writ ) (in question of whether plaintiff exercised due diligence, plaintiff entitled to believe defendant acted properly until plaintiff possessed facts showing that defendant acted improperly). JMB offered evidence that PPG said it did not know if other units would fail. Other evidence showed the windows had latent design defects and PPG failed to disclose the design defects. We find PPG's silence bears on JMB's diligence in investigating the problem. JMB looked to PPG, the *manufacturer, for help in determining the* problems with the window units. There was legally sufficient evidence that JMB exercised reasonable diligence in attempting to determine the cause of the problem and in attempting to correct it. Legally sufficient evidence supports a finding that JMB acted reasonably by relying on PPG's statements in its attempt to discover the nature of the window problem and in attempting to discover whether defective windows had been installed.

The evidence does not establish conclusively that JMB knew of the defect or that it failed to exercise reasonable diligence that would have led to the discovery of the defect. The discovery rule, as applied to the claims asserted under the DTPA and the twenty-year warranty, tolled the stat-

ute of limitations beyond the date of the 1989 tolling agreement.

### *Statute of Limitations under the Five–Year Warranty*

 Additionally, PPG argues that the five-year warranty claims are barred by limitations. Because the judgment can be supported on the jury's findings regarding JMB's DTPA and 20 year warranty claims, any presumed failure of the five-year warranty claim will not affect the validity of the judgment. We have, nevertheless, examined PPG's contention and find it has merit.

PPG promised under the terms of the five-year warranty that it would:

(1) guarantee that its Twindows would be free of defects for five years from April 1, 1978;

(2) pay all costs for replacement Twindows and the labor to remove defective Twindow units and to replace them with nondefective units;

(3) be responsible for *continuing corrections* to defective Twindow, if any, as well as PPG's labor beyond the five-year guarantee period if initial corrective measures were executed per the requirements above but later found to be inadequate and/or not acceptable after the specified five-year guarantee period;

(4) correct any defective units promptly after receiving notice of the defects.

The five-year warranty began in 1978 and expired in 1983. No cause of action was brought within the warranty period. However, JMB argues that the "continuing corrections" language in the warranty extended it beyond the five-year termination date. JMB claims that when some of the window units failed within five years, PPG replaced the specific failed units with similarly defective units. JMB contends that PPG's effort to correct the overall window problem, involving all the window units, was, as a whole, deficient and a breach of the five-year warranty under the "continuing corrections" language.

We find, however, the five-year warranty does not apply to the window project as a whole, such that PPG's alleged failure to correct the entire window project triggers the "continuing corrections" provision to an indefinite future date. Instead, each window unit is a separately warrantied item. We conclude, therefore, that the "continuing corrections" language does not extend the five-year warranty period. Accordingly, we sustain PPG's third issue.

### SUFFICIENCY OF THE EVIDENCE UNDER TWENTY-YEAR WARRANTY

In its fourth issue, PPG complains that the judgment on the twenty-year warranty should be reversed. The twenty-year "seal" warranty, which was published in Sweet's Architectural Guide, provided, in pertinent part:

Twindow units are warranted for twenty (20) years from the date of manufacture against failure of the hermetic seal due to faulty manufacturing of the unit by PPG. Pursuant to this limited warranty, PPG will only supply a new unit, and no labor, installation or special or consequential damages are included. This limited warranty is effective only if the unit is properly installed, and is not effective if the unit is installed in sloped glazing. PPG makes no other warranties.

PPG argues that the judgment based on the twenty-year warranty should be reversed because: (1) JMB failed to secure findings on all the essential elements of its twenty-year warranty theory; and (2) the trial court erred in finding that the twenty-year warranty applied as a matter of law. While the trial court's judgment can be supported by the jury's findings on the

DTPA questions alone, we will, nevertheless, address the issue.

■ If the trial court correctly found the twenty-year "seal" warranty applied as a matter of law, the trial court did not err in failing to submit to the jury questions regarding the essential elements of the warranty theory. *See* Tex.R.Civ.P. 278 (court must submit to jury only issues raised by pleadings and evidence); *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 391 (Tex.1997) (court properly refused to submit question to jury because question not supported by evidence). If an issue is conclusively established as a matter of law, the question should not be submitted to the jury. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222-23 (Tex.1992).

First, PPG argues that JMB failed to submit certain jury issues on the question of the twenty-year "seal" warranty. PPG contends that for JMB to prevail on its twenty-year "seal" warranty theory, it was required to prove all essential elements of the cause of action, including whether the affirmation of fact or promise was the basis of the bargain,[12] and whether JMB gave notice of the defect within a reasonable time.[13]

■ PPG contends that JMB did not prove the twenty-year warranty was part of the basis of the bargain because JMB did not offer evidence that it relied on the warranty. However, the comment to Section 2.313 of the Uniform Commercial Code provides:

[Section 2.313] deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.

*See* § 2.313 cmt. 3; *see also Sweco,* 808 S.W.2d at 115–16 (finding of reliance not necessary to support breach of warranty claim); *Walter E. Heller & Co. v. Da–Jor Const. Co.,* 460 S.W.2d 266, 272 (Tex.Civ. App.—Beaumont 1970, no writ) (reliance not an element of breach of warranty claim). It is sufficient that the representations were made as part of the sales process. *See Sweco,* 808 S.W.2d at 115–16; *Walter E. Heller,* 460 S.W.2d at 272; *see also General Supply & Equip. Co. v. Phillips,* 490 S.W.2d 913, 917–18 (Tex.Civ. App.—Tyler 1972, writ ref'd n.r.e.) (evidence that seller's advertising stated that panels would not deteriorate in five years supported findings that seller of greenhouse panels made express warranty which were made basis of bargain).

■ PPG acknowledges that it published the warranty in Sweet's Architectural Guide to induce customers to purchase its product. PPG claims it rescinded the twenty-year warranty and replaced it with a ten-year warranty before the sale at issue. PPG offered into evidence a letter, dated July 1, 1976, from Bob Wells, PPG senior vice president, informing the trade that PPG was offering a ten-year warranty, effective September 1, 1976. We find

---

**12.** *See* Tex.Bus. & Com.Code Ann. § 2.313(a)(1)(Vernon 1994); *Sweco, Inc. v. Continental Sulfur & Chem.,* 808 S.W.2d 112, 115 (Tex.App.—El Paso 1991, writ denied).

**13.** *See* Tex.Bus. & Com.Code Ann. § 2.607(c)(1) (Vernon 1994); *Lochinvar Corp. v. Meyers,* 930 S.W.2d 182, 189 (Tex.App.—Dallas 1996, no writ).

no evidence in the record, however, that the letter was, in fact, published or disseminated to anyone.

■ PPG also argues that the twenty-year warranty was not a basis of the bargain because it was not incorporated into the contract; however, it cites no authority for this contention. The twenty-year warranty, as a representation made by PPG during the sales process, was incorporated into the agreement and formed part of the basis of the bargain. *See Sweco,* 808 S.W.2d at 115–16; *Phillips,* 490 S.W.2d at 917–18; *Walter E. Heller,* 460 S.W.2d at 272. No evidence of rescission was offered.

As for PPG's reception-of-notice argument, the uncontroverted evidence shows that in 1982, Houston Center Corp. first notified PPG of a "halo effect" in some units. PPG inspected the units and saw the problem first-hand in the early 1980s. In July 1989, PPG was again notified of the failure of additional units. Moreover, PPG's notice to JMB in October 1989 that it would no longer replace failed units suggests that it had notice of the continuing problems.

■ The uncontroverted evidence shows that the twenty-year "seal" warranty was published and no evidence was offered that it was rescinded. Even if we were to assume the ten-year warranty was published to the trade and went into effect in July 1976, the ten-year warranty would not apply to this sale. Houston Center Corp. received PPG's bid to supply more than 12,000 units on April 9, 1976, three month before the purported institution of the ten-year warranty. On May 27, 1976, Houston Center Corp. accepted PPG's bid by signing the bid for award. On the same day, the contractor, Bellows, executed a contract with a subcontractor, Cupples Products, in which Cupples agreed to use the windows based on PPG's final bid.

This subcontract was attached to and incorporated into Cupples' contract with PPG. PPG's sales representations were made and the initial bids accepted before the purported institution of the ten-year warranty. To prove that the twenty-year warranty is not applicable, PPG offers the testimony from witnesses so stating. Such testimony is in the nature of conclusory legal opinions which are not binding on the court. *See Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (legal conclusions, conclusory statements not legally sufficient evidence). In the absence of any controverting evidence, the trial court did not err in finding the twenty-year warranty applied as a matter of law. The court also did not err in failing to submit jury instructions on "basis of the bargain" and notice. We overrule PPG's fourth issue.

## ATTORNEY FEES

In its fifth issue, PPG complains that the trial court erred in its attorney fee award because the addition of a postverdict "bonus" was neither reasonable nor necessary and because trial court failed to condition JMB's appellate attorney fees on appellate success. The attorney fee issue was tried to the bench after the jury verdict on the DTPA and breach of warranty claims. Because we find the trial court reviewed the total attorney fees to decide if these fees were reasonable and necessary, we find the trial court did not abuse its discretion.

■ A prevailing party on a DTPA claim is entitled to "reasonable and necessary" attorney fees. *See* TEX.BUS & COM. CODE § 17.50(d). Likewise, under section 38.001 of the Practices and Remedies Code, a prevailing party is entitled to "reasonable" attorney fees. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). We review an award of attorney fees under an abuse of discretion standard of review. *See Oake v. Collin County,* 692

S.W.2d 454, 455 (Tex.1985). We should view the evidence in the light most favorable to the trial court's ruling and indulge every presumption in its favor. *See Phillips & Akers, P.C. v. Cornwell,* 927 S.W.2d 276, 279 (Tex.App.—Houston [1st Dist.] 1996, no writ). Factors that a fact finder should consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997).

▆▆▆▆ JMB was awarded attorney fees of $1,716,181, which included a "bonus" of $300,000. The evidence showed the "bonus," which JMB called an "adjustment," was a modification of the hourly rate paid for taking the case to trial, "depending upon the difficulties at the trial and the results obtained," as well as the "preclusive effect which the case had on [the] firm's being engaged in other work." There was some evidence that the award was based, in part, on the attorney's success in presenting the case. We find that a fee based, even in part, upon the outcome of the case is a contingent fee that may not be transferred to the opposing party. Thus, to the extent the "adjustment" of the fee was dependent upon "the results obtained," the trial court had no authority to include it within its award of attorney fees.

However, JMB presented evidence that even with the fee "adjustment," the hourly rate was both reasonable and necessary. Accordingly, as the final arbiter of fact, the trial court may have determined that the $300,000 adjustment was not a "bonus" conditioned upon the outcome of the case, but a reasonable and necessary conformation of the fee agreement which met the proper legal standards for attorney fees. Thus, while there is some evidence the adjustment was based on the outcome of the suit, the trial court could have discounted that evidence in determining the reasonableness of the fee. In light of the record before us, we cannot say the trial court abused its discretion in awarding the fee.

▆▆▆▆ PPG further contends the trial court erred by not conditioning the award of appellate attorney fees upon a successful appeal. Although the judgment does not specify that attorney fees are contingent upon JMB's success on appeal, the award implicitly requires appellate success in order to recover the fees. *See Spiller v. Spiller,* 901 S.W.2d 553, 560 (Tex.App.—San Antonio 1995, writ denied). Thus, any error is harmless. *See Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 236 (Tex.App.—Houston [14th Dist.] 1996, writ denied). We overrule PPG's fifth issue.

Although we sustain PPG's third issue, we find the judgment can be supported without reliance upon the five-year warranty. Accordingly, the judgment of the trial court is affirmed.

Dissenting Opinion by Justice ANDERSON to follow.